# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE DIVISION

| | |
|---|---|
| **PHI GROUP, INC.** | **CIVIL ACTION** |
| **V.** | **NO.:** |
| **ZURICH AMERICAN INSURANCE COMPANY** | **JUDGE** |
| | **MAGISTRATE JUDGE** |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## <u>COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT</u>

COMES NOW, PHI Group, Inc. ("PHI"), which hereby files this COMPLAINT against Defendant Zurich American Insurance Company ("Zurich").

## <u>PARTIES</u>

### 1.

At all times pertinent hereto, PHI was and still is a corporation organized and existing pursuant to the laws of the State of Delaware.  PHI's principal place of business is in the State of Louisiana.

### 2.

Zurich was and still is a corporation organized and existing pursuant to the laws of the State of New York.  Zurich's principal place of business is in the State of Illinois.

## JURISDICTION AND VENUE

3.

This claim is brought pursuant to 28 U.S.C. § 1332.  This is a dispute between citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.

PHI is informed and believes and thereon alleges that Zurich is or at all relevant times was doing business in Louisiana and Lafayette Parish, by and through itself or its agents or intermediaries located in the United States or Louisiana.  Zurich is subject to personal jurisdiction in Louisiana by virtue of its business activities and operations in this State and its issuance of policies of insurance that cover Louisiana companies and risks located within the State, including the insurance policy that is the subject of this action.

5.

Zurich purposefully availed itself of the privilege of doing insurance business in Louisiana through its conduct in selling, underwriting, issuing, and handling claims under the insurance policy it sold PHI, and by contracting with and hiring others in connection with selling, underwriting, issuing, and handling claims under that policy.  This action arises out of Zurich's affirmative contacts with Louisiana, and this Court may exercise personal jurisdiction over Zurich.

6.

Venue for this action is proper in the United States District Court for the Western District of Louisiana because the insurance policy that Zurich issued to PHI was made and/or was to be performed in Lafayette Parish, where PHI's principal place of business is located, such that Zurich's obligations or liabilities arose, and Zurich's breach or breaches of contract and other wrongful conduct occurred, in Lafayette Parish.

## FACTUAL BACKGROUND

### PHI's Helicopter Operations

7.

PHI is one of the world's leading helicopter service companies.  It offers flight operations for numerous business sectors, including the offshore oil and gas, air medical, and technical services industries.  For example, PHI provides helicopter services for offshore oil and gas customers in the Gulf of Mexico and other places around the world.  Those customers hire PHI to provide flights supporting offshore oil and gas programs, with those flights occurring from PHI's own locations as well as its customers' locations.  In this way, the success of PHI's business depends on its customers' demand for flights.

8.

PHI also provides services for the healthcare industry through its Air Medical Group, which operates as PHI Health, LLC ("PHI Health").  PHI Health has its principal place of business in Phoenix, Arizona and is a wholly-owned subsidiary of PHI.  When created in 1981, PHI Health had a single medically-equipped helicopter.  Since then, PHI Health's fleet has increased to 100 helicopters and 5 fixed-wing aircraft, all with state-of-the-art medical interiors.  Like PHI, PHI Health conducts flights as requested by customers, so PHI Health's success necessarily depends on those customers scheduling flights.

### The Zurich Policy

9.

PHI purchased from Zurich Policy No. PPR6738778-07 for the policy period from February 1, 2020 to February 1, 2021 (the "Policy").  A copy of the Policy is attached hereto as Exhibit A.

10.

PHI is the "First Named Insured" under the Policy.  The term "Insured," as used in the Policy, includes both the "First Named Insured; and any subsidiary of the First Named Insured." Therefore, PHI and its wholly-owned subsidiary PHI Health are each an "Insured."

11.

The Policy was issued in consideration of PHI's payment of a premium, which PHI has paid in full.

12.

The Policy incorporates a policy form promulgated by Zurich that is known as the "EDGE" policy form.  As promoted by Zurich, the "EDGE" policy form provides "higher limits, broader coverage and greater flexibility," and has the "advantage" of being "clearly written with all limits, sub-limits and other critical coverage issues incorporated within the policy declarations."

13.

The Policy provides coverage for "direct physical loss of or damage caused by a **Covered Cause of Loss** to Covered Property, at an Insured Location."

14.

The Policy defines "**Covered Cause of Loss**" as "[a]ll risks of direct physical loss of or damage from any cause unless excluded."

15.

"Covered Property" means certain categories of property that are "located at an Insured Location or within 1,000 feet thereof or as otherwise provided for in this Policy," including "[t]he Insured's interest in buildings (or structures) including new construction, additions, alterations,

and repairs that the Insured owns, occupies, leases or rents"; and "[t]he Insured's interest in Personal Property"; and "Personal Property of officers and employees of the Insured."

16.

An "Insured Location" is, among other things, a "**Location**" that is "[l]isted on a Schedule of Locations on file with" Zurich.  "**Location**" is similarly defined to include those locations "[a]s specified in the Schedule of Locations."

17.

The Policy provides both "Time Element" and "Property Damage" coverages.  The Policy's total limit of liability, for all coverages, is $50,000,000, subject to a single deductible of $250,000 per "**Occurrence**."  An "**Occurrence**" is all loss or damage "attributable directly or indirectly to one cause or a series of similar or related causes."

18.

In the Policy, Zurich promised to pay for, *inter alia*, loss of income and extra expenses that PHI incurs during a "Suspension" (which the Policies define as a "slowdown or cessation") "of [its] business activities" as a result of "physical loss of or damage to" qualifying property.

19.

Other relevant "Time Element" coverages, described in more detail below, include the Policy's "Civil or Military Authority" coverage and "Contingent Time Element" coverage.

20.

The Policy also provides two "Property Damage" coverages that are relevant to PHI's losses and damages because of the coronavirus and COVID-19: the "Protection and Preservation of Property" coverage and the "Professional Fees" coverage.

21.

The Policy has no exclusions that would apply to preclude or limit coverage for PHI's losses.  In particular, the Policy lacks a "virus" exclusion. Zurich's "EDGE" policy base form contains an exclusion that references the word "virus," but an endorsement to the Policy amends the exclusion by, among other things, deleting the reference to "virus."

**The SARS-CoV-2 Pandemic**

<u>The Coronavirus and COVID-19 Can Cause Direct Physical Loss of or Damage to Property</u>

22.

COVID-19 is a deadly disease caused by the novel coronavirus known as SARS-CoV-2 (the "coronavirus").

23.

The coronavirus can be transmitted in several ways, including via human-to-human contact, airborne viral particles in ambient air, and touching surfaces or objects.  The coronavirus spreads easily from person to person, and person to surface or object, primarily through small, physical droplets expelled from the nose or mouth when an infected person speaks, yells, sings, coughs, or sneezes or through traces of those droplets on a person's hands.

24.

The coronavirus and coronavirus-containing respiratory droplets and nuclei are physical substances that are active on physical surfaces and are also emitted into the air.  Such substances

are not theoretical, informational, or incorporeal, but rather have a material existence and are physically dangerous.

25.

Physical droplets containing the coronavirus can land on objects and surfaces.  After landing on objects and surfaces, the coronavirus can remain present and dangerous for periods ranging from hours to many days.

26.

According to the WHO, people can become infected with the coronavirus by touching such objects and surfaces, then touching their eyes, nose, or mouth.  This indirect transmission via objects and surfaces is known as "fomite transmission."  As the WHO has noted, fomite transmission is "a likely mode of transmission for SARS-CoV-2" because studies have confirmed the existence of virus-laden droplets on objects and surfaces "in the vicinity of infected cases," and because it is well known that other coronaviruses can be transmitted via fomite transmission.

27.

Research has indicated that the coronavirus can be detected on certain surfaces even weeks after infected persons are present at a given location.

28.

One study, for example, found that the coronavirus remains active and dangerous on plastics for at least three days, while another reported that the coronavirus remained stable and viable for seven days on a range of common surfaces, including plastic, stainless steel, glass, and wood.  A third study detected viable coronavirus samples on glass, stainless steel, and money for approximately one month if left at or around room temperature.

29.

Indeed, Zurich acknowledges on its website that "[a]lthough the coronavirus spreads primarily through droplets in the air when someone coughs or sneezes, scientists have also determined that it can be contracted when someone touches a contaminated surface and then touches their eyes, nose or mouth."

30.

Research has also indicated that the coronavirus can spread through the air.  For example, airborne viral particles are known to have spread into a facility's heating and ventilation ("HVAC") system, leading to transmission of the coronavirus from person to person.

31.

According to the Centers for Disease Control and Prevention ("CDC"), the coronavirus is most likely to spread when people are within six feet of each other, and may spread from an infected person who is more than six feet away or who has left a given space.  Buildings and properties accumulate the virus indoors, which plays a significant role in community transmission.

32.

Before infected individuals exhibit symptoms—i.e., when they are "pre-symptomatic"— they are most contagious, as their viral loads will likely be very high, and they may not know they have become carriers.  In addition, studies from the CDC and others estimate that between 40% to 70% of infected individuals may never become symptomatic (referred to as "asymptomatic" carriers).  Pre- and asymptomatic carriers are likely unaware that they are spreading the coronavirus by merely touching objects and surfaces, or by expelling droplets or aerosols into the air.  The National Academy of Sciences has found that the majority of transmission is attributable to people who are not showing symptoms because they are either pre- or asymptomatic.

33.

Given these aspects, COVID-19 and the coronavirus can cause physical loss of or damage to property by, among other things, destroying, distorting, corrupting, attaching to, and physically altering property, including its surfaces, and by rendering property unusable, uninhabitable, unfit for intended function, dangerous and unsafe.

34.

Respiratory droplets (i.e., droplets larger than 5-10 µm) expelled from infected individuals land on, attach, and adhere to surfaces and objects.  In doing so, they physically change the property and its surface by becoming a part of that surface.  This physical alteration makes physical contact with those previously safe, inert surfaces (e.g., walls, handrails, desks) unsafe.

35.

When individuals carrying the coronavirus breathe, talk, cough, or sneeze, they expel aerosolized droplet nuclei (i.e., those smaller than 5 µm) that remain in the air and, like dangerous fumes, make the premises unsafe and dangerous.  This process alters the physical properties of air in buildings from safe and breathable to unsafe and dangerous.

36.

When the coronavirus and COVID-19 attach to and adhere on surfaces and materials, they become a part of those surfaces and materials, converting the surfaces and materials to fomites. This represents a physical change in the affected surface or material, which constitutes physical loss of and damage to that property.

37.

The presence of the coronavirus and COVID-19 within a facility causes physical loss of and damage to that facility by necessitating remedial measures that include without limitation

extensive cleaning and disinfecting, repairing or replacing air filtration systems, remodeling and reconfiguring physical spaces, and other measures to reduce or eliminate the presence of the coronavirus or COVID-19 on-site.

38.

The presence of the coronavirus on property also creates an imminent threat of further damage to that property or to nearby property.  Individuals who come into contact with respiratory droplets at one place in the facility by, for example, touching a doorknob will carry those droplets on their hands and deposit them elsewhere in the facility, causing more damage and loss.

Government Orders Limited Activities in Response to the Coronavirus and COVID-19

39.

The first presumptive positive case of COVID-19 in Louisiana was identified in the New Orleans metropolitan area on March 9, 2020.  The next day, two more presumptive positive cases were identified in the New Orleans area.  The coronavirus and COVID-19 then began to spread quickly throughout New Orleans, the surrounding parishes, and the entire State of Louisiana. Those known cases, as well as likely cases involving presymptomatic or asymptomatic carriers, resulted in physical damage to and loss of property in New Orleans, the surrounding parishes, and the rest of the State.

40.

On March 11, 2020, the Governor of the State of Louisiana issued Proclamation Number 25 JBE 2020, declaring a public health emergency in the State of Louisiana due to COVID-19.

41.

On March 22, 2020, the Governor issued Proclamation Number 33 JBE 2020, limiting public gatherings to no more than 10 people and imposing a general stay-at-home order, pursuant

to which all residents of Louisiana were directed to stay at home until April 13, 2020, unless performing an essential activity. That order was extended through April 30, 2020 by Proclamation Number 41 JBE 2020, and was further extended through May 15, 2020 by Proclamation Number 52 JBE 2020.

42.

Beginning in March 2020, similar "shelter-in-place" orders were issued by state and county governments across the country, including the states and counties in which PHI and/or its direct customers, suppliers, contract manufacturers, or contract service providers have a location at which they conduct business operations.  Those orders remained in place for varying lengths of time, but stayed in place in many states and localities through May 2020 and remain in place today.

**PHI Has Sustained Losses Covered under the Policy**

PHI Has Suffered Direct Physical Loss of or Damage to Insured Property

43.

As noted, the Policy provides coverage for "[a]ll risks of direct physical loss of or damage from any cause unless excluded."  PHI has suffered direct physical loss of and damage to covered property, including but not limited to property belonging to PHI Health.

44.

On information and belief, individuals with COVID-19 or otherwise carrying the coronavirus have been physically present at the insured facilities of each PHI location, including the locations of PHI Health.  The presence of the coronavirus and COVID-19, including but not limited to coronavirus droplets or nuclei on solid surfaces and in the air at insured property, has caused and will continue to cause direct physical damage to physical property and ambient air at those premises.  Coronavirus, a physical substance, has attached and adhered to PHI's property,

and by doing so, altered that property.  Such presence has also directly resulted in loss of use of those insured facilities.

45.

PHI employees have tested positive for COVID-19 on various dates and at various locations during 2020.  Persons who tested positive for COVID-19 were present at or on insured property, including but not limited to PHI's and/or PHI Health's aircraft, on various dates during 2020.  Persons who came into contact with persons diagnosed with COVID-19 were present at or on insured property, including but not limited to PHI's and/or PHI Health's aircraft, on various dates during 2020.

46.

On information and belief, persons who were pre-symptomatic or asymptomatic and unknowingly carrying the coronavirus, including but not limited to employees and passengers, were present at or on insured property, including but not limited to PHI's and/or PHI Health's aircraft, on various dates during 2020.

47.

Coronavirus droplets have been conveyed from infected persons (whether symptomatic, pre-symptomatic, or asymptomatic) to solid surfaces, including but not limited to furniture, doors, floors, buttons, equipment, and supplies, and into the air at insured property, causing damage and alteration to physical property and ambient air at the premises.

48.

PHI has sustained actual loss, including but not limited to substantial sums spent to remediate physical damage to insured property, including property of PHI Health, by, for example, cleaning and disinfecting premises, implementing additional passenger screening measures,

remodeling and reconfiguring physical spaces to permit social distancing, and taking other measures to reduce or eliminate the presence of the coronavirus on such property. Such remediation measures have been ongoing because of the continuous and repeated recurrence of the coronavirus while the pandemic persists.

<u>PHI Has Sustained Insured "Time Element" Losses</u>

49.

Under the main "Time Element," or business interruption, coverage, Zurich promised to pay "the actual Time Element loss the Insured sustains" during the Period of Liability, which is described in more detail in Section 4.03 of the Policy. Such loss must "result from the necessary **Suspension** of the Insured's business activities at an Insured Location," where that "**Suspension**" is "due to direct physical loss of or damage to" property of the type "insurable" under the Policy that is "caused by a **Covered Cause of Loss** at the **Location**."

50.

Section 7.69.01 specifically defines "**Suspension**" to include the "slowdown or cessation of the Insured's business activities."

51.

PHI and PHI Health have suffered direct physical loss of or damage to property of the type insured under the Policy. That direct physical loss of or damage to insured property led to a significant decrease in the volume of flights carried out by PHI. That business slowdown, in turn, caused PHI and PHI Health to sustain substantial losses in revenue.

52.

In addition, PHI and PHI Health have incurred reasonable and necessary extra expenses to continue temporarily as nearly normal as practicable the conduct of their businesses due to the

slowdown of operations, including but not limited to extra expenses for COVID-19 screening and testing, cleaning supplies, and physical and structural modifications to ensure social distancing.

53.

The Policy also provides "Special Coverage" for "Civil or Military Authority," under which the Insured can recover loss from a "necessary **Suspension** of the Insured's business activities at an Insured Location if the **Suspension** is caused by order of civil or military authority that prohibits access to the **Location**." That order must result from the civil authority's response to "direct physical loss of or damage caused by a **Covered Cause of Loss** to property" that is "not owned, occupied, leased or rented by the Insured or insured under this Policy" and is within five miles of the Insured's Location.

54.

Similarly, under the "Special Coverage" for "Contingent Time Element" loss, the Insured can recover actual Time Element loss during the Period of Liability that directly results from "the necessary **Suspension** of the Insured's business activities at an Insured Location," if that "**Suspension** results from direct physical loss of or damage" to property at, *inter alia*, "**Direct Dependent Time Element Locations**."

55.

"**Direct Dependent Time Element Locations**" include any "**Location**" of a direct "customer, supplier, contract manufacturer or contract service provider to the Insured," or of "any company under a royalty, licensing fee or commission agreement with the Insured."

56.

The government shelter-in-place orders described above have all been issued as a direct result of, among other things, physical loss of or damage to property that is not owned, operated,

leased, or rented by PHI or PHI Health and is located within five statute miles of those entities' locations.  Such physical loss and damage has been caused by the coronavirus and COVID-19.

57.

The physical loss of or damage to property caused by the presence of coronavirus, in addition to government orders, have contributed to the slowdown of PHI's and PHI Health's business activities at insured locations, as the orders have significantly reduced the volume of PHI's flights from those locations.  The orders have also led to decreased demand for flights from PHI's and PHI Health's customers, including but not limited to customers in the offshore oil and gas and healthcare industries, because people have been unable to pursue activities deemed non-essential by the orders.

58.

PHI has also sustained losses directly resulting from the slowdown of its own business operations at insured locations due to physical loss of or damage caused by the coronavirus and COVID-19 at its customers' locations.  For example, because of the dangers posed by the spread of the coronavirus and COVID-19, and to ensure the safety of employees, PHI's oil and gas customers modified their flight schedules to incorporate longer shifts at offshore oil platforms.

59.

This change, and other similar changes to account for the presence of the coronavirus and COVID-19, caused those customers to schedule significantly fewer flights with PHI.  PHI Health experienced similar declines in flight volumes.  Consequently, the business operations of PHI and PHI Health slowed down, and they sustained considerable actual loss.

<u>PHI Has Incurred Insured Costs to Protect and Preserve Insured Property</u>

60.

Under the "Protection and Preservation of Property" coverage, the Insured can recover its "reasonable and necessary costs incurred for actions to temporarily protect or preserve Covered Property," if those actions are "necessary due to actual or imminent physical loss or damage due to a **Covered Cause of Loss**" to that property.

61.

The coronavirus and COVID-19 can cause direct physical loss of or damage to insured property, as detailed above, and has been present on or around the insured property of PHI and PHI Health.  Both entities have incurred reasonable and necessary costs to temporarily protect or preserve insured property despite the presence or imminent presence of the coronavirus, including but not limited to costs to implement preventative COVID-19 screening and testing for employees and passengers and the cost of enhanced cleaning and disinfecting measures.

62.

In addition to the losses and coverages described above, PHI's COVID-19 losses are covered under any and all other coverages under the Policy that may apply.  These include but are not limited to the "Professional Fees" coverage.

<u>No Exclusion Bars or Limits Coverage for PHI's Losses and Damages</u>

63.

The Policy has no exclusion that would preclude or limit coverage for PHI's losses and damages in this action.  For example, the Policy does not contain any exclusion for pandemics or global pandemics.

64.

Section 3.03.01.01 of the Policy originally contained an exclusion for "**Contamination**, and any cost due to **Contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy, except as provided by the Radioactive Contamination Coverage of this Policy."

65.

Section 7.09 of the Policy originally defined "**Contamination (Contaminated)**" as "[a]ny condition of property due to the actual presence of any foreign substance impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, **Fungus**, mold or mildew."

66.

"**Contaminant(s)**" was defined slightly differently, in Section 7.10, to mean "[a]ny solid, liquid, gaseous, thermal or other irritant, pollutant or contaminant including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste (including materials to be recycled, reconditioned or reclaimed), asbestos, ammonia, other hazardous substances, **Fungus** or **Spores**."

67.

However, Zurich changed all three provisions through the Policy's Amendatory Endorsement – Louisiana (the "Louisiana Endorsement").  Zurich deleted and replaced Section 3.03.01.01 of the Policy in its entirety, so that section now reads: "**Contamination** or asbestos, and any cost due to **Contamination** or asbestos including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy."

68.

The Louisiana Endorsement also deleted and replaced Section 7.09 of the Policy in its entirety, so that section now reads: "**Contamination (Contaminated)** – Any condition of property due to the actual presence of any **Contaminant(s)**."

69.

Similarly, the Louisiana Endorsement deleted and replaced Section 7.10 of the Policy in its entirety, so that section now reads: "**Contaminant(s)** – Any solid, liquid, gaseous, thermal or other irritant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste (including materials to be recycled, reconditioned or reclaimed), other hazardous substances, **Fungus** or **Spores**."

70.

Following the deletions and replacements in the Louisiana Endorsement, the Policy does not exclude any loss, damage, or cost related to or caused by pathogens, pathogenic organisms, bacteria, viruses, or disease-causing and illness-causing agents.

### PHI's Claim and Zurich's Denial

71.

PHI provided timely written notice to Zurich of its claim for losses under the Policy on April 4, 2020, through PHI's insurance broker Marsh Wortham.  PHI's letter noted several of the coverage provisions in the Policy that are identified in this Complaint.

72.

Zurich acknowledged receipt of notice on April 7, 2020.  After acknowledging receipt, Zurich requested details concerning the nature of PHI's loss.  Before PHI could provide that information, on May 8, 2020, Zurich sent PHI a reservation of rights letter referencing Policy language that purportedly applied to PHI's claim.  That letter cited the "Contamination" exclusion

in Section 3.03.01.01 of the Policy, but did not point out that the provision had been replaced

through the Louisiana Endorsement.  The letter also focused exclusively on the "Time Element"

and "Civil or Military Authority" coverages, even though PHI had invoked other applicable

coverages in its April 2020 notice to Zurich.

73.

PHI provided the additional details requested by Zurich in early June 2020.  Shortly

thereafter, the Zurich claims representative assigned to PHI's claim responded by thanking PHI

and stating that Zurich would "complete a full review," "follow up accordingly," and "continue to

stay in contact."

74.

Zurich did not stay in contact as promised.  Instead, nearly two months later, on August 11,

2020, Zurich sent PHI a letter denying its claim entirely.  The primary bases for Zurich's denial

were the supposed absence of "direct physical loss of or damage to" property, as well as the

"Contamination" exclusion in the original Policy.  Zurich's denial letter again ignored the

Louisiana Endorsement that had significantly rewritten that exclusion.

75.

Zurich's letter also suggested that PHI only had twelve months from the date of loss to

commence legal action against Zurich related to PHI's claim, pursuant to Section 6.13.06 of the

Policy.  PHI twice requested extensions of this deadline, but Zurich denied both requests.

76.

Zurich's assertion about the twelve-month period was false.  In reality, the Louisiana

Endorsement deleted and replaced the original Section 6.13.06, so that provision now says that

"[l]egal action must be started within (24) twenty-four months after the date of direct physical loss or damage to Covered Property or to other property as set forth herein."

77.

In addition, Louisiana law governing insurance contracts delivered and to be performed in Louisiana—specifically, Louisiana Revised Statute § 22:868—precludes provisions that limit any right of action against the insurer to less than twenty-four months.  The original version of Section 6.13.06 incorporates this law by reference.

78.

On March 30, 2021, PHI notified Zurich that its assertions regarding the twelve-month period conflicted with Louisiana law and the Louisiana Endorsement.  Zurich failed to respond to that letter before the filing of this Complaint.

## COUNT ONE

### (Declaratory Judgment)

79.

PHI repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 78 of this Complaint as though set forth fully herein.

80.

Louisiana Code of Civil Procedure article 1871, *et seq.*, and 28 USC 2201, 28 USC 2202, and FRCP 57 entitle this Court to declare the rights and other legal relations of the parties to this dispute.

81.

An actual and justiciable controversy exists between the parties concerning Zurich's contractual duties to pay PHI's claim for actual loss and other losses and damages sustained under the Policy.

82.

The controversy between PHI and Zurich with respect to the Policy is ripe for judicial review.

83.

The controversy is of sufficient immediacy to justify the issuance of declaratory relief.

84.

Accordingly, PHI seeks a judgment declaring that:

A.     PHI's claim triggers the Policy's coverage provisions identified in this Complaint;

B.     No exclusion or other provision in the Policy applies to limit coverage for PHI's claim;

C.     PHI has satisfied or has been excused from satisfying, or Zurich has waived or is estopped from enforcing, all conditions precedent under the Policy; and

D.     Zurich is contractually obligated under the Policy to indemnify PHI for its claim of actual loss sustained and other losses and damages due to the coronavirus and COVID-19.

## COUNT TWO

### (Breach of Contract)

85.

PHI repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 84 of this Complaint as though set forth fully herein.

86.

The Policy is a valid and enforceable contract for insurance between PHI and Zurich.

87.

PHI has satisfied or been excused from satisfying, or Zurich has waived or is estopped from enforcing, all conditions precedent under the Policy, including but not limited to payment of required premiums, provision of timely notice of claim, and submission of a Proof of Loss.

88.

As is set forth more fully above, Zurich is contractually obligated under the Policy to indemnify PHI for the full amount of PHI's actual loss sustained and other losses and damages as a result of the coronavirus and COVID-19, including losses covered under the Policy's coverage provisions identified in this Complaint.

89.

Nonetheless, Zurich has failed to pay for PHI's losses, in breach of the Policy.

90.

As a direct and proximate result of its breach of contract, Zurich has deprived PHI of the benefits of the insurance coverage for which it paid substantial premiums, which entitles PHI to money damages, including interest according to law.

91.

Zurich's breach of the Policy has caused PHI damages in excess of $15 million.  PHI reserves the right to seek the full and exact amount of its damages at the time of trial.

**COUNT THREE**

**(Breach of the Duty of Good Faith and Fair Dealing)**

92.

PHI repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 91 of this Complaint as though set forth fully herein.

93.

Louisiana Revised Statute § 22:1973(A) imposes a duty of good faith and fair dealing on insurers in adjusting claims, and states that any insurer who breaches these duties shall be liable for any damages as a result of the breach.

94.

Zurich has breached its duty of good faith and fair dealing by:

A. Failing to assess PHI's claim under all relevant coverage provisions in the Policy, including the coverage provisions identified above, even when PHI had provided Zurich with information implicating those coverage provisions;

B. Taking positions that it knew or reasonably should have known were contrary to the express promises made to PHI, the expressed, reasonable expectations of the insured, the mutual intent of the parties to the insurance contract, or the customs and practices of the insurance industry;

C. Deciding without any reasonable basis in fact, law, or the customs and practices of the insurance industry, and for its own purposes and to serve its own desires, to take unreasonable positions concerning its obligations;

D. Construing facts to support its own position rather than construing the facts in favor of coverage as required by law;

E.      Denying PHI's claim based on a version of the Policy's "Contamination" exclusion that does not exclude coverage for "loss," and is not operative in any event, as Zurich amended and replaced the exclusion through the Louisiana Endorsement;

F.      Denying PHI's claim based solely on its receipt of PHI's preliminary claim details, without staying in contact with PHI concerning the claim as promised;

G.      Falsely asserting that PHI was required to file suit against Zurich for its wrongful denial of coverage within twelve months of the date of PHI's loss, and refusing to reconsider its position after being notified by PHI that its position was contrary to Louisiana law and the terms of the Policy, as amended by the Louisiana Endorsement;

H.      Unreasonably delaying the performance of its obligations to PHI; and

I.      Forcing PHI to litigate to obtain all benefits due under the Policy.

95.

Louisiana Revised Statute § 22:1973(C) provides that where the insurer has breached its duties of good faith and fair dealing, "[i]n addition to any general damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties against the insurer in an amount to exceed two times the damages sustained or five thousand dollars, whichever is greater."

96.

Because Zurich has breached its duties of good faith and fair dealing in adjusting PHI's claim under the Policy, PHI is entitled to recover penalty damages from Zurich, in addition to the

amount of PHI's actual loss sustained and other losses, in an amount of up to double the damages sustained by PHI as a result of Zurich's breach of its duties of good faith and fair dealing.

## REQUEST FOR JURY TRIAL

PHI requests a trial by jury.

WHEREFORE, PHI prays that, after due proceedings, this Honorable Court enter Judgment in favor of PHI and against Zurich declaring that the Policy provides coverage for PHI's actual loss sustained and other losses and damages related to its claim, as set forth more fully above, and awarding:

      a.      Compensatory and consequential damages against Zurich in an amount to be proven at trial;

      b.      Pre-judgment and post-judgment interest at the maximum legal rate;

      c.      Court costs and reasonable attorneys' fees and costs incurred in obtaining the benefits due under the Policy;

      d.      Interest on such court costs and attorneys' fees and costs; and

      e.      Such other and further relief that the Court deems just and proper.

Respectfully submitted:


*s/ Robert M. Kallam*
Robert M. Kallam (#20242)
Brian J. Lindsey (#35887)
**KEAN MILLER LLP**
600 Jefferson Street, Suite 1101
Lafayette, LA  70501
Telephone:  (337) 235-2232
E-mail: robert.kallam@keanmiller.com
        brian.lindsey@keanmiller.com


Gretchen Hoff Varner (*pro hac vice
forthcoming*)
Thomas Martecchini (*pro hac vice forthcoming*)
**COVINGTON & BURLING LLP**
Salesforce Tower, 415 Mission Street
San Francisco, CA 94105
Telephone:  (415) 591-6000
E-mail: ghoffvarner@cov.com
        tmartecchini@cov.com


**ATTORNEYS FOR PHI GROUP, INC.**